MICHAEL, Circuit Judge,
concurring in part and dissenting in part:
The Cincinnati Insurance Company issued a commercial property policy to S. Wallace Edwards & Sons, Inc., a wholesaler of ham products. The insurance company agreed to “pay for direct physical loss or damage to Covered Property.” Edwards seeks payment of $155,000 for discarded ham that it claims was damaged by exposure to ammonia gas in a cold storage facility when a refrigerant line was cracked by a forklift. I concur in part II of the majority’s opinion, which holds that the insurance company waived its defense under the policy provision that requires the insured to bring an action for coverage within two years of the damage. I respectfully dissent, however, from part III of the majority’s opinion because I believe there is a genuine issue of material fact about whether the ham was damaged by the ammonia gas. This factual dispute precludes the award of summary judgment to Edwards, the insured. See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Fed. R.Civ.P. 56(e).
The majority points to evidence proffered by Edwards that indicates the ham was damaged by ammonia gas. The problem is that the insurance company proffers evidence, which I will summarize, that goes the other way. An employee of Richmond Cold Storage, where the ham was stored, conducted litmus tests on the ham on two occasions, just after the accident and later during repackaging; neither set of tests showed any ammonia contamination to the ham. J.A. 395, 398-403, 418-22. Edwards engaged Microbac Laboratories, Inc., an independent laboratory, to evaluate the ham. In Microbac’s first analysis of the ham, each of three samples had an ammonia content of less than 0.10 percent, well within the range the International Association of Refrigerated Warehouses considers acceptable. J.A. 252, 255, 276. David Danis, Microbac’s laboratory director who supervised the testing of the three samples, said that the ammonia levels in the samples “were all at insignificant levels when compared to the control *376 ham hock.” J.A. 287. In Microbac’s second analysis of seventeen samples, sixteen had ammonia levels within the range that typically occurs in nature. J.A. 247-49, 381-83. One sample had a higher than normal ammonia content, but an expert explained that the ham’s age could have caused the heightened ammonia level. J.A. 382-83. Barbara Starks, a Microbac employee, performed smell and visual tests on the ham samples. Starks did not detect the smell of ammonia about the ham. J.A. 281. Starks did note that the ham was discolored in places, that is, it had brown areas. Id Starks acknowledged that she did not know how ammonia exposure affected the appearance of ham, but she said that the “brown areas were similar to the appearance of product that had been frozen for some time.” Id
Microbac, the laboratory chosen by Edwards to test the ham, consistently concluded that the ham was not tainted by the ammonia exposure. Microbac’s initial report to Edwards stated that “testing verified that no ammonia residue was present” and that “the meat evaluated falls within acceptable ammonia guidelines for food products.” J.A. 252. A second version of the report, which Microbac claims it produced in response to pressure from an Edwards employee, J.A. 255, stated that Microbac could not determine the cause of the brown areas, but it still concluded that the ham was “within acceptable ammonia guidelines for food products.” J.A. 253. Both reports stated that Microbac’s analyst did not detect an ammonia odor about the ham. J.A. 252-53.
The evidence proffered in the summary judgment proceedings makes clear that a court cannot decide on summary judgment which side is right in this case. There is a genuine factual dispute about whether the ham was damaged by the ammonia leak. I would therefore vacate the award of summary judgment to Edwards and remand the case for trial.